

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00119-CV

CONGLOMERATE GAS II, L.P. AND
VANCOUVER SKY MANAGEMENT,
L.L.C.

APPELLANTS AND APPELLEES

V.

GREGG GIBB

APPELLEE AND APPELLANT

----------

### FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 236-237790-09

----------

## MEMORANDUM OPINION ON REHEARING[1]

----------

Appellee and Cross-Appellant Gregg Gibb filed a motion for rehearing and

a motion for reconsideration en banc of our opinion that issued on August 6,

2015.  We deny both motions, withdraw our opinion and judgment dated

---

[1]*See* Tex. R. App. P. 47.4.

August 6, 2015, and substitute the following to address Gibb's arguments on rehearing.

## I. INTRODUCTION

Gibb sued Appellants and Cross-Appellees Conglomerate Gas II, L.P. and Vancouver Sky Management, L.L.C. to recover damages for Appellants' failure to comply with an alleged agreement to assign Gibb a back-in working interest in minerals under a tract of land that Gibb helped Conglomerate CEO D. Alan Meeker sell. A jury ultimately sided with Gibb, awarding him damages and attorneys' fees. Appellants raise five issues on appeal, but we address only their first because it is both meritorious and dispositive. Gibb raises four conditional cross-points, but they are unpersuasive. Therefore, as to Gibb's cross-appeal, we will affirm, but as to Appellants' appeal, we will reverse and render a judgment that Gibb take nothing on his contract claim.

## II. BACKGROUND

Meeker is an oil and gas and real estate businessman based in Fort Worth. At the times relevant to this case, he managed and conducted the business operations of several Texas limited liability companies, including Crestview Farm, L.L.C. and Crestview Resources, L.L.C. Meeker also served as the CEO of Conglomerate, a Texas limited partnership formed to perform oil and

2

gas development and production in the Barnett Shale, and as the manager of Vancouver Sky Management, L.L.C., Conglomerate's general partner.[2]

Gibb is a licensed real estate broker with over forty years' experience. He focuses his business on large tracts of real estate located in and around the Dallas/Fort Worth area.

Rock Creek Ranch is a 2,233-acre tract of undeveloped land located approximately half an hour south of Fort Worth. As of the late 1980s, MTV Real Estate Limited Partnership owned 100% of the surface estate and 50% of the mineral estate. Rock Creek Ranch's previous owners retained the other 50% of the mineral estate and leased it to Carrizo Oil & Gas.

## A. Rock Creek Ranch Transactions and Gibb's Brokerage Commission

Operating through Crestview Farm, Meeker contacted MTV in June 2004 and offered to purchase Rock Creek Ranch. Several months later, in October 2004, Crestview Farm and MTV entered into a Purchase and Sale Agreement whereby MTV agreed to sell the entire surface estate of Rock Creek Ranch to Crestview Farm for $20,097,000, or $9,000 per acre. MTV also agreed to deliver an oil and gas mineral lease to Crestview Farm's choice of either Crestview Resources or Antero Resources.

---

[2]Our reference to Appellant Conglomerate Gas II, L.P. as Conglomerate should not be confused with Conglomerate Gas I, another entity that Meeker formed.

3

Crestview Farm did not have the money to cover the $20 million purchase price, but according to Meeker, he planned to collaborate with a partner to develop the land. A development deal never came to be, so with the help of retained Washington, D.C. attorney Ross Eichberg, Meeker searched for a buyer to flip 1,983 acres of Rock Creek Ranch's surface.[3] MTV agreed to extend the Purchase and Sale Agreement several times, and Crestview Farm paid MTV $10,000 per month for the option to keep the Purchase and Sale Agreement open.

In late April 2005, Eichberg contacted Gibb about finding a buyer for Rock Creek Ranch. Gibb met Meeker sometime soon thereafter and toured the property. In a May 1, 2005 letter that Meeker addressed to Gibb, Meeker set out detailed information about Rock Creek Ranch, including the status of the mineral interests.[4] By the next day, May 2, 2005, Gibb had started working to sell the tract even though he did not have a brokerage agreement in place. Gibb did so because "[t]ime was of the essence. This property was ready to sell."

One of the potential buyers for Rock Creek Ranch was the Texas General Land Office (GLO), which at the time was seeking to purchase real estate for investment. Jim Rose at the GLO had contacted Matthew Hurlbut at

---

[3]Meeker planned to keep the remaining 250 acres for his personal use.

[4]Meeker stated that he and his brother "own an oil & gas company, which has the lease commitment on the 1116 net acres that the Seller now owns. Our lease has been committed to our exploration and development agreement with our development partner."

4

Transwestern, a real estate brokerage firm, and Henry Knapek at Transwestern contacted Gibb, whom Knapek knew from a previous transaction. On May 3, 2005, Gibb gave Knapek and Hurlbut a list of tracts that Gibb thought might be of interest to the GLO. One of the tracts was Rock Creek Ranch. Gibb, Rose, and the Transwestern brokers met and toured the property, and Gibb reached a handshake deal with Transwestern that if Gibb sold Rock Creek Ranch to the GLO, he would split the commission 50/50 with Transwestern.

On May 3, 2005, Eichberg emailed Gibb a brokerage agreement dated the same day and between Crestview Farm, Gibb, and Roca Beda Properties, LLC, a brokerage company used by Eichberg. The agreement stated that Crestview Farm hires Roca Beda and Gibb to find a buyer; that Crestview Farm intended to offer to sell Rock Creek Ranch's surface estate, less 250 acres, for $21,213,500; and that approximately $20,097,000 of the purchase price would be paid to the owner of the property (MTV) pursuant to Crestview Farm's option agreement. Regarding a brokerage fee to be paid by Crestview Farm, the agreement provided that the fee would equal the difference between the amount that Crestview Farm paid MTV for the property ($20,097,000) and the amount that Crestview Farm received for the resale of the property, with 80% of that figure paid to Gibb and 20% paid to Roca Beda.[5] However, if the fee was $500,000 or

_____

[5]The agreement gave an illustration: "[I]f the actual purchase price paid by Buyer is $21,213,500, then the Fee will be $1,116,500 (shared by Roca Beda and [Gibb] per section 3 below)[.]"

5

less, then Gibb would "retain the entire Fee and Roca Beda [would] be 'made whole' pursuant to a separate agreement with Crestview." Gibb did not like the offer—obviously, because depending on the resale price, which was unknown at that point, the potential existed that he could be paid a brokerage fee as little as $1, and Gibb did not "work for $1 or $10 for something like this"—so he struck through the portion of the "$500,000 or less" language and wrote in the margin, "No expenses" and "The minimum fee will be 500,000." Gibb returned the document to Eichberg.

Meeker considered Gibb's request for a minimum $500,000 commission unacceptable. He claimed, "From the very beginning I had told [Gibb] . . . that all expenses of the sale, *including the brokerage commission*, had to be borne by the sale of the Rock Creek bed." [Emphasis added.] Meeker reiterated this in an email that he sent Gibb on May 16, 2005, regarding a brokerage commission owed Gibb if Hillwood (another potential buyer) purchased Rock Creek Ranch. Gibb understood Meeker's email to mean that to make a commission, he would "have to add it on . . . the base price [of] $20,097,000."

By mid to late May 2005, Hillwood was still in the running to purchase Rock Creek Ranch, but the GLO was the most promising prospect in Crestview Farm's opinion because it could pay cash, close quickly, and was not concerned about obtaining zoning. Although Meeker opposed paying Gibb a minimum commission, Gibb continued to ask for one after the May 16, 2005 email.

Meeker therefore decided that he "would try to come back to [Gibb] with an offer that would . . . probably bridge a gap."

On May 23, 2005, Meeker sent Gibb the following email:

This email is to notify you that I have agreed that you would be due a commission under the terms of our commission agreement should you be successful in closing a sale of the Rock Creek Ranch, through Crestview Farm LLC (Crestview), to the [GLO]. Crestview will not accept any offer lower than $20,097,000.00, nor will Crestview bring any money to a closing table to pay brokerage fees. All costs of the sale must be borne by the transaction and payable out of funds at the closing brought by a buyer.

*Additionally, in the event you are successful in selling the surface of the Rock Creek Ranch to the [GLO], and [Conglomerate] leases the Minerals under the Rock Creek Ranch, Conglomerate will assign to you a 3% back in working interest on a well-by-well basis on the acreage Conglomerate leases under the aforementioned ranch.*

Agreed and Accepted this 23rd day of May, 2005

/s/ D. Alan Meeker
CEO Conglomerate Gas II LP. [Emphasis added.]

Gibb understood the first paragraph to mean that Crestview Farm would not guarantee a minimum commission. As for the second paragraph, Gibb called Meeker and asked him what he meant by a 3% back-in working interest on a well-by-well basis. According to Gibb, Meeker said, "[T]hat's a lot more than your cash commission on the surface." Gibb responded, "Thank you very much." Gibb did not respond to the May 23, 2005 email in writing, but he continued working towards closing a deal with the GLO.

7

On June 15, 2005, the GLO, on behalf of the Texas Permanent School Fund, sent Gibb a nonbinding letter of intent to purchase 1,983 acres of Rock Creek Ranch for $9,500 per acre. Crestview Farm counteroffered to sell the land for $10,600 per acre, or $21,019,800, which the GLO accepted by July 9, 2005.[6]

By August 24, 2005, Crestview Farm and the GLO had signed a final contract, and as of late August 2005, the contract was in the title company. One provision stated, "Seller [Crestview Farm] has informed Buyer that, by separate agreement, Seller is liable for a commission in respect of this transaction to [Gibb and Roca Beda]." Another provision prohibited the GLO from paying more for the land than its fair market value as determined by an appraisal. Thus, if the property failed to appraise, the GLO could terminate the contract or the parties could agree to lower the price.

By August 29, 2005, "a lot of agreements . . . [had] floated across [Gibb's] desk," so he sent Eichberg a fax that asked him to "review our current [brokerage] agreement," to clean it up, to date and sign it, and to add a 3% back-in working interest. The attachment contained a version of the May 3, 2005 brokerage agreement that Gibb had altered by requesting a $500,000 minimum commission. Gibb did not hear back from Meeker or Eichberg, so on

---

[6]Therefore, excluding costs, the difference between the price that Crestview Farm agreed to pay MTV to purchase Rock Creek Ranch's surface ($20,097,000) and the price that the GLO agreed to pay Crestview Farm for 1,983 acres of Rock Creek Ranch's surface ($21,019,800) was $922,800, more than the $500,000 minimum commission that Gibb had requested.

September 15, 2005, Gibb emailed Meeker and again asked him to "restate our brokerage agreement to incorporate all of our agreements regarding commission into one document." Gibb again mentioned the 3% back-in working interest.

Meeker responded to Gibb's request a week later, on September 22, 2005, by emailing him a brokerage agreement that set Gibb's commission at 80% of the difference between Rock Creek Ranch's purchase price and its sales price. The agreement did not contain a provision for a 3% back-in working interest, but it stated, "There is a separate agreement between Crestview and Gibb . . . regarding the mineral rights of the Property." Gibb did not sign the agreement because according to him, "[i]t didn't follow the first agreements or any of the things we talked about."

On October 3, 2015, Gibb sent Meeker a fax once again asking him to "restate current in place commission agreements" and to "submit a[n] oil & gas commission agreement as per your email." Meeker called Gibb and told him that "there was not a three percent back-in available and it looked like . . . the cash commission would be enough to satisfy [Gibb's] minimum desires, the 500,000." Meanwhile, Gibb and Transwestern executed a written memorandum of understanding that Gibb would pay Transwestern 50% of the commission he received for brokering the sale of Rock Creek Ranch to the GLO.

By October 20, 2005, the property had appraised for more than the sales price, but the parties still did not have a final written brokerage agreement in place. On October 28, 2005, Gibb emailed Eichberg a signed copy of the May 3,

9

2005 brokerage agreement that did not contain the interlineations that Gibb had made when the agreement was originally circulated back in May, nor did it contain a provision for a 3% back-in working interest. On November 7, 2005, Gibb's attorney sent Meeker a letter stating that it was Gibb's understanding that upon the closing of the sale of Rock Creek Ranch, he would receive a commission equal to (1) 80% of the difference between the price that the GLO paid Crestview Farm and the price that Crestview Farm paid MTV and (2) a 3% back-in working interest on a well-by-well basis on the acreage that Conglomerate leased under Rock Creek Ranch. Meeker asked his attorney to try to work out a compromise with Gibb.

On November 17, 2005, Crestview Farm, Gibb, and Roca Beda signed an agreement that Gibb and Roca Beda would be paid a commission in the amount of $862,900, with 80% paid to Gibb and 20% paid to Roca Beda. However, the agreement expressly reserved the issue of the 3% back-in working interest. That same day, MTV closed on its sale of Rock Creek Ranch's surface to Crestview Farm, and the next day, Crestview Farm closed on its sale of 1,983 acres of Rock Creek Ranch to the GLO. Gibb received a cash commission in the amount of $690,305.74, which he split 50/50 with Transwestern.

### B. Oil & Gas Activity

In March 2005, while Meeker was looking for a buyer for Rock Creek Ranch, Conglomerate and Chesapeake Exploration Limited Partnership entered into an Exploration and Development Agreement (EDA) whereby Conglomerate

10

agreed to offer Chesapeake the exclusive option to purchase all oil and gas interests that Conglomerate, or one of its affiliates, acquired in the Barnett Shale. Chesapeake's election under the EDA was triggered only if Conglomerate acquired at least 75% of a particular interest. In addition to paying Conglomerate the acquisition costs plus $100/acre, if Chesapeake elected to acquire an interest, it agreed to convey Conglomerate a 15% carried working interest and the right to purchase a 15% look-back interest in each well drilled, that is, a total 30% mineral leasehold interest.

As contemplated by Crestview Farm's Purchase and Sale Agreement with MTV, on March 28, 2006, Crestview Resources leased MTV's 50% mineral interest under Rock Creek Ranch. Shortly thereafter, Crestview Resources purchased Carrizo's leases of the remaining 50% of the minerals under Rock Creek Ranch. Crestview Resources subsequently assigned all of the leases to Chesapeake, and on March 1, 2007, Chesapeake assigned Conglomerate a 15% carried working interest in minerals under Rock Creek Ranch. Conglomerate also exercised its right under the EDA to acquire an additional 15% look-back interest in a number of wells. In July 2008, Conglomerate sold its mineral interests under the EDA, including those under Rock Creek Ranch, to Chesapeake.

## C.    Litigation

Gibb sued Appellants in May 2009 for breach of contract. He alleged in his fifth amended original petition that as part of his commission for brokering the

11

sale of Rock Creek Ranch to the GLO, a valid and enforceable contract existed whereby Conglomerate agreed to assign him a 3% back-in working interest on a well-by-well basis if (i) he sold Rock Creek Ranch to the GLO and (ii) Conglomerate leased the minerals under the tract, as set out in the May 23, 2005 email from Meeker to Gibb. Gibb averred that Conglomerate had breached the agreement because although both conditions had been met, Conglomerate had failed to assign him a 3% back-in working interest (or to remit the value of the interest to him). Gibb also alleged claims for fraud, statutory fraud, intentional interference with contract, and commingling, among others.

At trial, the parties disputed not only whether there was an agreement to assign Gibb a 3% back-in working interest, but also the meaning of a 3% back-in working interest on a well-by-well basis, the percentage of minerals under Rock Creek Ranch that were subject to a 3% back-in working interest, the type of working interest that Gibb was seeking, and the amount of damages resulting from Appellants' alleged breach.[7] The trial court granted Appellants a directed verdict on Gibb's tort claims but let the jury resolve the contract dispute. The jury found that Gibb and Conglomerate had reached an agreement on a back-in working interest, that Conglomerate had failed to comply with the agreement, and that the breach had occurred on March 1, 2007. The jury awarded Gibb

[7]The parties' damages figures ranged from as low as $8,025 to as high as $2.9 million, depending on the model used.

damages in the amount of $1,833,599.38 and attorneys' fees in the amount of $1,743,363.26 for representation in the trial court and on appeal.

### III. AGREEMENT FOR 3% BACK-IN WORKING INTEREST

Appellants argue in their first issue that the evidence is legally insufficient to support the jury's answer to question number one that an agreement existed between Gibb and Conglomerate to assign Gibb a 3% back-in working interest on a well-by-well basis on the acreage that Conglomerate leased under Rock Creek Ranch. Relying on well-established contract-formation law that a counteroffer operates as a rejection of the original offer, Appellants contend that instead of accepting the May 23, 2005 offer for a back-in working interest, Gibb rejected it by repeatedly insisting on a $500,000 guaranteed minimum commission—the very same thing that Meeker had repeatedly refused to accept. According to Appellants,

> Simply put, Gibb would not agree to a brokerage agreement that did not have a $500,000 guaranteed minimum commission because of his fear that the sale would fall through or that the sale price would be reduced. On the other hand, for the same reason, Crestview Farm would not agree to any guaranteed commission. There was simply no meeting of the minds [regarding the 3% back-in working interest] because all offers and counter offers had been rejected.

Gibb responds that legally sufficient evidence supports the jury's answer to question number one because Gibb accepted the May 23, 2005 email both verbally and by performance and because Meeker admitted that an agreement existed.

13

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

A valid contract is one of the essential elements of a breach-of-contract claim. *See Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.). Parties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Id.* at 670. An acceptance must be clear and definite and may not change or qualify the material terms of the offer. *Amedisys, Inc. v.*

14

*Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 513–14 (Tex. 2014); *Coleman v. Reich*, 417 S.W.3d 488, 491 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Stated otherwise, an acceptance must be *identical* with the offer to make a binding contract. *Schriver v. Tex. Dep't of Transp.*, 293 S.W.3d 846, 851 (Tex. App.—Fort Worth 2009, no pet.). A purported acceptance that changes or qualifies an offer's material terms constitutes a rejection and counteroffer rather than an acceptance. *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 74 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Whether the parties intended to enter into a binding agreement is often a question of fact. *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988).

The May 23, 2005 email constituted one offer with two material terms—a cash commission in the first full paragraph and a back-in working-interest commission in the second full paragraph. Meeker acknowledged at trial that in the first full paragraph, he was "reasserting" his offer of a cash commission for 80% of the difference between the purchase price and sale price of Rock Creek Ranch. And regarding the language that Crestview Farm would not "bring any money to a closing table to pay brokerage fees" and that "[a]ll costs of the sale must be borne by the transaction and payable out of funds at the closing brought by a buyer," Gibb acknowledged at trial that he understood this to mean that Meeker would *not* guarantee a minimum commission, something that Gibb had expressly sought several weeks earlier when he made the interlineations to the May 3, 2005 proposed brokerage agreement. The second full paragraph set out

15

the term for a 3% back-in working interest on a well-by-well basis on the acreage that Conglomerate leased under Rock Creek Ranch. Therefore, for a valid and binding agreement to exist between Gibb and Conglomerate for a 3% back-in working interest, Gibb must have accepted the May 23, 2005 email offer without changing or qualifying either of its material terms. *See Amedisys*, 437 S.W.3d at 513–14. He did not do so.

Meeker testified that there was no agreement reached with Gibb on a back-in working interest because Gibb "would always counter saying he wanted and needed a $500,000 minimum on his commission." Specifically, Meeker testified that after sending Gibb the May 23, 2005 email, Gibb "came right back" and said that he wanted a minimum commission. Meeker thought that the issue had been resolved once Crestview Farm and the GLO reached an agreement for the sale of Rock Creek Ranch on July 9, 2005—because 80% of the difference between the price to purchase the land and the price to sell it was more than the $500,000 that Gibb had demanded—but after the final contract arrived in late August—and contained several contingencies to closing, including that the property appraise for at least the sale price—Gibb called Meeker the very next day and "started demanding a half million dollar minimum again," as reflected in Gibb's August 29, 2005 fax to Eichberg. After Meeker sent Gibb the September 22, 2005 email offer, Gibb "countered it by requesting a minimum commission again." Even as late as early October, Gibb was still requesting a

16

minimum commission, which apparently led to a heated telephone discussion between Gibb and Meeker. According to Meeker,

> I told Mr. Gibb emphatically that I will not nor will I ever agree to a minimum commission, that I'm happy to pay him 80 percent of the difference, that the three percent back-in was offered up as a compromise and a bridge that he was trying to do the $500,000 minimum.

Thus, according to Meeker, Gibb "continued time and again every month all the way through the end of October asking for a $500,000 minimum."

Gibb's relevant testimony was mostly no different. He admitted that he had asked for a minimum commission in the days after receiving the May 23, 2005 email offer, and even after then. Gibb testified,

A. I was going to ask for it for quite a while, yes.

Q. You continued to ask for it in the days following May 23rd, 2005, through at least the time of the State's letter of intent in June, correct?

A. I think even later than that.

Q. So continually you refused to agree to the first part of Mr. Meeker's offer?

A. That was Mr. Meeker's terms.

Q. It was. True. And you continually refused to agree to the first one?

A. I'm still looking for a brokerage fee. I need a base of 500,000.

. . . .

Q. You still needed your base on May 23rd, 2005?

17

A.      Yes, sir.

Q.      You still needed your base in June of 2005?

A.      Yes, sir.

Q.      You still needed your base in July of 2005?

A.      Yes, sir.

Q.      You still needed your base in August of 2005?

A.      Yes, sir.

Q.      You still needed your base in September of 2005?

A.      Yes, sir.

Q.      And you continued to request it, correct?

A.      Yes, sir.

Gibb confirmed that he continued working on the deal even though he did not "want to accede to a contract that didn't have a minimum and [Conglomerate was] unwilling to accede to a contract that did."

Gibb argues that the evidence does not conclusively establish that he rejected the May 23, 2005 email offer by counteroffering for a minimum commission because the "later requests" that he made pertained to buyers *other than* the GLO. Gibb directs us to his testimony that after receiving the May 23, 2005 email, he "was working on the GLO deal knowing that there was no minimum commission being paid on that." He testified,

> . . . *In my mind*, I was moving a little further ahead in trying to see, *in my mind*, if the State was going to close this or not. I still was trying to get a minimum commission to cover me in case Hillwood

18

would be coming in right behind this and pick it up. I would like to have a base on that *is what I was meaning*. [Emphasis added.]

We emphasized parts of Gibb's testimony for a reason. It is well established that in determining whether parties reached a meeting of the minds, objective manifestations of intent to be bound are relevant but unexpressed subjective intentions are not. *Harrison v. Williams Dental Grp., P.C.*, 140 S.W.3d 912, 916 (Tex. App.—Dallas 2004, no pet.). Indeed, contract-formation cases commonly recite that the determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind. *See, e.g.*, *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pets. denied). Gibb's testimony about what he was thinking when he made later requests for a minimum $500,000 commission is therefore irrelevant; Meeker could not have known what was going on in Gibb's head when he requested a minimum commission. Gibb contends that the letter from his attorney on November 7, 2005, and the final agreement for a cash commission on November 17, 2005, are "[c]onsistent with [his] position that he only continued to request a minimum commission for buyers other than the GLO" because neither document mentioned a minimum commission. However, the November 2005 letter and agreement are no objective bases upon which Meeker could have concluded that Gibb sought a minimum commission for buyers other than the GLO because, simply enough, they were not part of the circumstances

19

constituting what Gibb said and did when he requested the minimum commission. *See id.* Moreover, there was no reason to mention a minimum commission in either document because by November 7, 2005, the property had appraised for more than the sales price, and the final agreement reflected exactly that—the parties' final agreement, not some term that may or may not have been involved in the negotiations leading up to the agreement.

Gibb argues alternatively that the evidence does not conclusively establish that he rejected the May 23, 2005 email offer because he specifically testified that he neither countered nor rejected Meeker's May 23, 2005 email. The testimony went like this:

> Q. Okay. Did you . . . counter any of this?
>
> A. No, sir.
>
> . . . .
>
> Q. Okay. Did you reject it?
>
> A. No, sir.

We absolutely agree with Appellants that this testimony is conclusory. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (reasoning that bare conclusions, even if unobjected to, cannot constitute probative evidence); *see also Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012) (stating that *Coastal*'s holding is not limited to expert testimony). Therefore, it is no evidence.

20

Gibb argues that there is legally sufficient evidence of an agreement for a 3% back-in working interest based on certain objective actions and communications of the parties, including (i) that Gibb accepted the May 23, 2005 email offer when he called Meeker on the telephone, questioned him about a 3% back-in working interest, and told him, "Thank you very much"; (ii) that Gibb accepted the May 23, 2005 email offer by performance, i.e., by securing the sale of Rock Creek Ranch to the GLO; and (iii) that Gibb admitted the existence of an agreement in his September 22, 2005 brokerage-agreement offer. Two contract-formation rules foreclose all three of Gibb's arguments.

As we have already explained, an acceptance must be identical with the offer to make a binding contract. *Schriver*, 293 S.W.3d at 851. In other words,

> [F]or an offer and an acceptance to constitute a contract, the acceptance must meet and correspond with the offer in every respect, neither falling within nor going beyond the terms proposed, but exactly meeting (those terms) at all points and closing with them just as they stand.

*Uniroyal, Inc. v. Chambers Gasket & Mfg. Co.*, 380 N.E.2d 571, 575 (Ind. Ct. App. 1978). Therefore, to the extent that Gibb purported to accept the 3% back-in working interest during his phone call with Meeker, the partial acceptance was legally ineffective because the evidence conclusively demonstrates that Gibb

rejected Meeker's offer for a cash commission, *the other* material term contained in the May 23, 2005 email offer.[8]

As for Gibb's acceptance-by-performance and admission arguments, a party cannot accept an offer that has been withdrawn or that has already been rejected. *See, e.g.*, *Legal Sec. Life Ins. Co. v. Ward*, 373 S.W.2d 693, 698 (Tex. Civ. App.—Austin 1963, no writ); *see also Crews v. Sullivan*, 113 S.E. 865, 867 (Va. 1922) ("The other party, having once rejected the offer, cannot afterwards revive it by tendering an acceptance of it."). Thus, Gibb could not accept by performance an offer that he had previously rejected by making a counteroffer for

---

[8]Gibb testified,

> Q.    . . . But we established this morning that both terms were not agreed to back in May at a minimum, correct?
>
> A.    Yes, sir.
>
> Q.    Because you would not agree to Mr. Meeker's first term, right?
>
> A.    Yes, sir.

Meeker testified,

> Q.    Now, after you sent Exhibit 60 [the May 23, 2005 email offer], did the matter of a minimum commission drop?
>
> A.    No.
>
> Q.    Why do you say that?
>
> A.    Because he came right back and said, Well, I'll take both. I want everything. I want a minimum commission and I want a mineral interest.

22

a minimum cash commission, nor could Meeker's purported "admission" in the September 22, 2005 email that a separate agreement existed for a mineral interest have any legal relevance in light of Gibb's prior rejection of the May 23, 2005 email offer.[9]

Gibb asserts three different arguments in his motion for rehearing and motion for en banc reconsideration, but they each ultimately have the same goal—eliminating the legal effect of, or at least diverting attention away from, the conclusive evidence involving the material term for a cash commission. Specifically, Gibb argues that we misapply the legal-sufficiency standard of review because we rely on testimony in opposition to the verdict—Meeker's version of events—rather than on testimony in support of the verdict—Gibb's version of events. The standard of review requires that we disregard evidence contrary to the challenged finding *unless a reasonable factfinder could not. See City of Keller*, 168 S.W.3d at 827. Indeed, in *City of Keller*, Justice Brister identified and discussed several categories of contrary evidence that *must* be considered in a legal sufficiency review. *Id.* at 810–18. One of those categories is conclusive evidence. *Id.* at 814–17. "When evidence contrary to a verdict is conclusive, it cannot be disregarded." *Id.* at 817. As we explained above, the evidence conclusively demonstrates that Gibb rejected the portion of the May 23, 2005 email offer for a cash commission. The legal effect of this conclusive

---

[9]Gibb agreed at trial—and the other evidence showed—that the May 23, 2005 email was the only offer for a 3% back-in working interest.

23

evidence is that there could not have been an agreement for a 3% back-in working interest as a matter of law because Gibb did not accept both of the May 23, 2005 email offer's material terms. *See Amedisys*, 437 S.W.3d at 513–14. Meeker's testimony is therefore precisely the type of contrary evidence that we cannot disregard in performing our legal sufficiency review.[10]

Gibb also argues on rehearing that we should not consider evidence that Gibb rejected Meeker's offer for a cash commission because the jury was not asked about a minimum commission—the first material term of the May 23, 2005 email—but only whether Gibb and Conglomerate had reached an agreement for a 3% back-in working interest—the second material term contained in the May 23, 2005 email.[11] Jury question number one does not foreclose our consideration of whether the parties agreed to a minimum commission because it expressly instructed the jury on the law directly pertinent to those specific and relevant facts. It stated in relevant part,

---

[10]Gibb argues that we fail to credit all of the evidence supporting the verdict, but in light of the preclusive effect of the conclusive contrary evidence, doing so would not result in a different outcome.

[11]Jury question number one asked,

Did Plaintiff Gibb and Defendant Conglomerate Gas agree that if Gibb successfully sold the surface estate of Rock Creek Ranch to the Texas General Land Fund and Conglomerate Gas leased the minerals under Rock Creek Ranch, Conglomerate Gas would assign Gibb a 3% back in working interest on a well by well basis on the acreage leased by Conglomerate Gas?

24

A purported acceptance that changes or qualifies an offer's material terms constitutes a rejection and counteroffer rather than an acceptance. Any attempt to change an offer operates as a rejection and counteroffer.

Once an offer has been rejected, the offeree no longer has the power to accept it and cannot revive the offer by tendering acceptance by performance.

To divorce evidence regarding an agreement for a minimum commission from a legal sufficiency analysis considering whether the parties reached an agreement for a 3% back-in working interest would have the dual effect of erroneously (i) disregarding the trial court's binding instructions and (ii) ignoring *City of Keller*'s clear pronouncements involving contrary conclusive evidence.

Gibb further argues that we inappropriately apply bilateral contract law to a unilateral contract case. He contends that the second material term of the May 23, 2005 email—in which Meeker offered Gibb a 3% back-in working interest if Gibb sold the Rock Creek Ranch to the GLO and Conglomerate leased the minerals thereunder—created a unilateral contract, that the charge instructed the jury that it could consider evidence of Gibb's acceptance of the mineral-interest offer either by return promise *or* by performance, and that Gibb accepted the offer for a mineral interest by performance.[12] Although the charge certainly instructed the jury that "acceptance of an offer may be shown if a person performs under the terms of the agreement, if any," it also stated that for that

---

[12]"A unilateral contract is created by the promisor promising a benefit if the promisee performs. The contract becomes enforceable when the promisee performs." *Plano Surgery Ctr. v. New You Weight Mgmt. Ctr.*, 265 S.W.3d 496, 503 (Tex. App.—Dallas 2008, no pet.).

provision to apply, the person must not have "previously rejected [the offer]." As we explained above, Gibb swiftly rejected the first material term contained in the May 23, 2005 email offer establishing a cash commission. By doing so, and consistent with the charge's instruction, Gibb eliminated his ability to accept by performance the other material term contained in the very same no-longer-existing offer. *See, e.g., Lamb v. Decatur Fed. Sav. & Loan Ass'n*, 411 S.E.2d 527, 529–30 (Ga. Ct. App. 1991) ("[A]s the counteroffer acted to reject immediately and nullify the original offer, any subsequent performance on the part of appellant in quitting the premises could not unilaterally breathe life into the then non-existing original offer . . . .") (citations omitted).

Finally, directing us to the Restatement (Second) of Contracts, Gibb argues that his acceptance by performance of the offer for a 3% back-in working interest did not depend upon a minimum commission. *See* Restatement (Second) of Contracts § 61 (1981). Along those same lines, Gibb also contends that even if his request for a minimum commission constituted a counteroffer, it did not preclude him from accepting the offer for a mineral interest by performance. These arguments are unpersuasive because Gibb could not accept by performance a term contained in an offer that he had previously rejected.

The evidence is legally insufficient to support the jury's answer to question number one that an agreement existed between Gibb and Conglomerate to assign Gibb a 3% back-in working interest on a well-by-well basis on the acreage

26

that Conglomerate leased under Rock Creek Ranch. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807; *Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334. Accordingly, we sustain Appellants' first issue and do not reach their remaining issues. *See* Tex. R. App. P. 47.1.

## IV. Gibb's Conditional Cross-Points

In four conditional cross-points, Gibb argues that the trial court erred by directing a verdict against him on his fraud, intentional interference, and commingling claims and by submitting jury question number four, which asked the jury to determine the date that Appellants breached the contract.

### A. Directed Verdict

A directed verdict is proper only under limited circumstances: (1) when the evidence is insufficient to raise a material fact issue, or (2) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied). In reviewing a directed verdict, we follow the standards for assessing legal sufficiency of the evidence. *See City of Keller*, 168 S.W.3d at 823. We review the evidence in the light most favorable to the person suffering the adverse judgment, and we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827; *see also Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).

27

### 1.    Common-Law Fraud and Statutory Fraud

Reliance is a necessary element of common-law fraud.  *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010).  To prevail, a plaintiff must demonstrate that he justifiably relied upon a false and material misrepresentation to his detriment.  *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998).  The elements of statutory fraud under the business and commerce code are essentially identical to the elements of common-law fraud except that the statute does not require proof of knowledge or recklessness as a prerequisite to recovering damages. *See* Tex. Bus. & Com. Code Ann. § 27.01(a) (West 2015); *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 726 (Tex. App.—Waco 1998, pet. denied).

Gibb argues that Meeker made a false representation (1) in his May 1, 2005 letter when he stated that he and his brother owned an oil and gas company that had the lease commitment on the minerals owned by MTV and (2) in his May 23, 2005 email, in which Meeker promised Gibb a 3% back-in working interest.  Gibb states that in those documents, Meeker and Conglomerate represented that *Conglomerate* had the right to lease the minerals and would be the leasing entity, but because the Purchase and Sale Agreement between Crestview Farm and MTV only allowed *Crestview Resources* or *Antero Resources* to lease the minerals, "Meeker could not utilize Conglomerate as the lessee, and what he promised Gibb in the May 23 email was impossible."

We disagree with Gibb that Meeker's promise for a 3% back-in working interest in the May 23, 2005 email was "impossible" because Conglomerate acquired a 30% lease interest in the Rock Creek Ranch minerals. But even more than that, there is no evidence of detrimental reliance by Gibb. Gibb argues that he detrimentally relied on the May 23, 2005 representation because he "gave up half of his cash commission and believed that he would receive a working interest instead." However, Gibb confirmed at trial that in deciding to represent the property as a broker, he did not rely on Meeker's representation in the May 1, 2005 letter about leasing MTV's minerals. Indeed, at that point, Meeker had not yet made the May 23, 2005 offer for a working interest. As for the May 23, 2005 representation for a 3% back-in working interest, Gibb may very well have "believed that he would receive a working interest," but when he did not, it was not because Meeker could not utilize Conglomerate as the lessee of MTV's minerals—the primary fact underlying Gibb's fraud claim, which Appellants also contest—but because Meeker disagreed that the parties had reached an agreement for a 3% back-in working interest. *See, e.g.*, *Gray v. Waste Res., Inc.*, 222 S.W.3d 522, 525 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (reasoning that "Gray, as a plaintiff, needed to show he failed to purchase his pro rata shares of WRI under the equity recapitalization plan because of his reliance on a misrepresentation by WRI" but that the evidence showed that "Gray attempted to borrow money in order to purchase the shares, but was unable to secure financing"). Along those same causal-connection lines, Gibb did not lose

29

half of his commission because he relied on Meeker's alleged "impossible" promise for a 3% back-in working interest; he "gave up half of his cash commission" because he agreed to split it with Transwestern, who brought the GLO to the table. In fact, Gibb testified that splitting his commission was something that he welcomed,

> Q. Now, the only potential purchaser . . . that you had brought [of] the three who could close within a year was the State?
>
> A. Was the State, correct.
>
> Q. And you testified yesterday, I believe, that somehow, as I recall, it harmed you to have to sell the property to the State rather than another potential purchaser because you had to split your commission with the folks at Transwestern, right?
>
> A. I didn't use the word "harm."
>
> Q. Well, . . . was it a negative fact for you? Was it somehow a problem for you, that selling to the State would require you to split your commission with the folks at Transwestern?
>
> A. It did not upset me or anything like that. I was happy to see the State have the cash to do it. I did not mind at all splitting, as I do most of the time, with a co-broker.
>
> Q. And that's my question. Selling to the State and having to split your commission was not at all unusual, was it?
>
> A. Not really.
>
> Q. In fact, at least 80 percent of the time you have to . . . split your commission with another broker?
>
> A. Yes. And I welcome that.

Gibb also alleged a claim for fraud by nondisclosure based on the same allegations that Meeker failed to disclose to Gibb that only Crestview Resources

30

or Antero Resources could lease MTV's minerals. Fraud by nondisclosure is simply a subcategory of fraud, because when a party has a duty to disclose, the nondisclosure may be as misleading as a positive misrepresentation of facts. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). Gibb's nondisclosure claim therefore fails for the same reason that his common law and statutory fraud claims failed—there is no evidence raising a material fact issue that Gibb relied to his detriment on Meeker's purported misrepresentations about Conglomerate's right to lease MTV's minerals. The trial court did not err by directing a verdict in favor of Appellants on Gibb's fraud claims, and we overrule his first conditional cross-point.

### 2. Intentional Interference with an Existing Contract

Gibb's interference claim relied upon the same facts as his fraud claims. He contends that Meeker intentionally interfered with the May 23, 2005 email because when he drafted it—and identified *Conglomerate* as the leasing entity in the second paragraph—he had full knowledge that only *Crestview Resources* or *Antero Resources* could lease MTV's minerals under Rock Creek Ranch pursuant to the Purchase and Sale Agreement between Crestview Farm and MTV.

Gibb's interference action required proof of the following: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. *See Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998). Regarding

31

causation, Gibb argues that "Meeker's interference was the proximate cause of damages to Gibb *because it allowed Meeker to take the position that the conditions of the May 23 email did not occur, which was his justification for not conveying Gibb his mineral interest*." [Emphasis added.] This reasoning is inconsistent with the trial record, which even Gibb acknowledges on a different page of his brief. In a footnote, Gibb states,

> During the course of the litigation, Meeker argued multiple times that Conglomerate could not have breached the May 23 email because one of its conditions did not occur: Conglomerate did not lease the minerals. *However, Meeker ultimately changed his position for trial and admitted that if the parties agreed to the May 23 email, then its conditions were met, and Gibb should have been assigned a mineral interest.* [Emphasis added.] [record citations omitted]

Our assessment of the evidence is exactly the same. Meeker justified not assigning Gibb a back-in working interest because, in his opinion, *no agreement existed* for a mineral interest, not because one of the conditions in the second full paragraph of the May 23, 2005 email did not occur. In fact, Meeker even conceded that had there been a valid agreement to assign Gibb a 3% back-in working interest, *the assignment would have been due on March 1, 2007*, when Chesapeake assigned Conglomerate a 15% carried working interest in minerals under Rock Creek Ranch. There is no evidence that Gibb's alleged damages were proximately caused by Meeker's identifying Conglomerate as the leasing entity in the May 23, 2005 email. Therefore, the trial court did not err by directing

32

a verdict in favor of Appellants on Gibb's claim for intentional interference with an existing contract.[13]

### 3. Commingling

The doctrine of commingling of goods attaches when the commingled goods of different parties are so confused that the property of each cannot be distinguished. *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 818 (Tex. 1974). Gibb pleaded a commingling claim "because Conglomerate sold virtually all of its interests in the oil and gas wells to Chesapeake in a cash sale. [] The sale included Conglomerate's *(and Gibb's)* interest under the EDA in the Rock Creek Ranch minerals." [Emphasis added.] However, Gibb had no interest in any part of the mineral interests that Conglomerate ultimately sold to Chesapeake in 2008 because no enforceable agreement for a 3% back-in interest existed. The trial court therefore properly directed a verdict on Gibb's commingling claim. We overrule his third conditional cross-point.[14]

---

[13]Gibb states in his brief that "Meeker orchestrated *Crestview Resources* becoming the lessee instead of Conglomerate in an attempt to deny Gibb the mineral interest he was promised under the May 23 email." [Emphasis added.] If this is an alternative theory of interference, then it is unpersuasive, and a directed verdict was proper, because the evidence showed that Conglomerate had not been formed at the time that Crestview Farm entered into the Purchase and Sale Agreement with MTV and identified Crestview Resources as one of two potential lessees of MTV's minerals.

[14]Gibb also argues that the trial court abused its discretion by admitting Plaintiff's Exhibit 243, which "was probative of [his] commingling theory," but any error was harmless because the trial court properly granted a directed verdict on Gibb's commingling claim.

**B.     Jury Question Number Four**

Gibb argues that the trial court erred by submitting jury question number four, the date that Appellants breached the contract. Gibb conditions this argument on a determination by this court that there was no or insufficient evidence of damages as of March 1, 2007, the date the jury found that Appellants had breached the May 23, 2005 email. We did not reach that issue because we sustained Appellants' first issue. Moreover, for that same reason, any error in submitting the question was harmless. We overrule Gibb's fourth conditional cross-point.

## V. CONCLUSION

Having overruled Gibb's conditional cross-points, we affirm the trial court's judgment as to Gibb's tort claims. Having sustained Appellants' first issue, we reverse the trial court's judgment and render judgment that Gibb take nothing on his breach-of-contract claim. *See* Tex. R. App. P. 43.2(c).

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL:   WALKER and MEIER, JJ.; and CHARLES BLEIL (Senior Justice, Retired, Sitting by Assignment).

DELIVERED:  October 15, 2015